**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

IDA L. LEYBA,                                    No. CIV S-07-0002-CMK

        Plaintiff,

    vs.                                           MEMORANDUM  OPINION AND ORDER

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

       Plaintiff, who is proceeding with retained counsel, brings this action for judicial

review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

Pursuant to the consent of the parties, this case is before the undersigned for final decision on

plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-motion for summary

judgment (Doc. 17).

**I.  PROCEDURAL HISTORY**

       Plaintiff applied for social security benefits on November 28, 2000.  In her

application, plaintiff claims her disability began on March 26, 1999.  Plaintiff claims her

disability consists of a combination of degenerative disc disease, cervical spine, left shoulder

impingement and a pain disorder.   Plaintiff is a United States citizen born January 9, 1959 with a

1

high school equivalent education. Plaintiff's claim was initially denied. Following denial of her

request for reconsideration, plaintiff requested an administrative hearing, which was held on

May 1, 2002, before Administrative Law Judge ("ALJ") William C. Thompson, Jr. The ALJ

originally found plaintiff not disabled in an opinion issued August 15, 2002. Plaintiff appealed

this decision to the Appeals Council. The Appeals Council vacated this decision and remanded

the matter back to the ALJ on September 17, 2004. The Appeals Council believed that further

consideration was needed to be given to plaintiff's subjective complaints in order to determine

their effect, if any, upon her ability to perform work-related functions, and that further evaluation

and rationale regarding the medical opinion evidence of record was needed. The Council

directed the ALJ to:

> Evaluate [plaintiff's] subjective complaints and provide rationale
> in accordance with the disability regulations pertaining to
> evaluation of symptoms (20 CFR 404.1529) and pertinent circuit
> case law and Social Security Ruling 96-7p; and
>
> Give further consideration to [plaintiff's] maximum residual
> functional capacity during the entire period at issue and provide
> rationale with specific references to evidence of record in support
> of assessed limitations (Social Security Ruling 96-8p). In so doing,
> evaluate the treating and examining source opinions pursuant to the
> provisions of 20 CFR 404.1527 and Social Security Rulings 96-2p
> and 96-5p, and explain the weight given to such opinion evidence.
> As appropriate, the Administrative Law Judge may request the
> treating and examining sources to provide additional evidence
> and/or further clarification of the opinions and medical source
> statements about what the claimant can still do despite the
> impairments (20 CFR 404.1512). The Administrative Law Judge
> may enlist the aid and cooperation of the claimant's representative
> in developing evidence from the claimant's treating sources.

Another administrative hearing was held on November 29, 2005. In his April 19, 2006, decision,

the ALJ made the following findings:

> 1.    The claimant meets the nondisability requirements for a period of
>       disability and Disability Insurance Benefits set forth in Section 216(i) of
>       the Social Security Act and is insured for benefits through December 1,
>       2004.
>
> 2.    The claimant has not engaged in substantial gainful activity since the
>       alleged onset of disability.

3.    The claimant's degenerative disc disease; cervical spine impairment; left shoulder impairment and pain disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    I find the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the following residual functional capacity: the claimant can perform a range of light work as follows: lift 20 pounds occasionally and 10 pounds frequently; stand and walk in combination for 6 hours; sit without limit when not standing or walking; no overhead reaching with the left nondominant arm; limited to occasional reaching, handling and fingering with the left nondominant arm; and, a slightly decreased sensation in the left nondominant arm.

7.    The claimant is unable to perform her past relevant work (20 CFR § 404.1565).

8.    The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

9.    The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.   Transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.   The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.   Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as photo counter clerk of which there are 12,000 positions in the state of California and usher of which there are 16,000 positions in the state of California.

13.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits. After the Appeals Council declined review of this decision on November 2, 2006, this appeal followed.

/ / /

## II.  SUMMARY OF THE EVIDENCE

**A.**     **Summary of the Medical Evidence**

The certified administrative record ("CAR") contains the following medical records:

1.     April 2, 1998 to March 25, 1999 – Healthcare Clinical Lab records (CAR 187-190);

2.     January 28, 1999 to May 19, 1999 – Advance Physical Therapy records (CAR 191-203);

3.     May 21, 1999 – Medical report by Steven D. McCormick, Ph.D. (CAR 204-211);

4.     June 15, 1999 to August 2, 1999 – Medical records from Dr. Levin (Pain Management Consultant) (CAR 212-224)

5.     January 15, 1999 to November 29, 1999 – Medical records from Donald E. Kobrin, MD (CAR 225-257);

6.     October 11, 1999 to February 25, 2000 – Medical records from D'Arcy and Associates (CAR 258-283);

7.     March 24, 1999 to May 24, 2000 – Lodi Memorial Hospital records (CAR 284-289);

8.     November 11, 2000 to January 3, 2001 – Medical records from Ian S. MacMorran, M.D. (CAR 290-303);

9.     January 17, 2001 – Medical report from Rebecca Jordan, M.D. (CAR 304-309);

10.    February 18, 2001 – Psychiatric Evaluation by Andrea R. Bates, M.D. (CAR 310-314);

11.    March 8, 2001 – Residual Functional Capacity Assessment (Mental) (CAR 315-332);

12.    March 2, 2001 to May 9, 2001 – Medical records from Mary Brown, M.D. (CAR 333-337);

13.    December 7, 2000 to July 9, 2001 – Residual Functional Capacity Assessment (Physical) (CAR 338-372);

14.    September 25, 1996 to March 16, 2002 – Medical records from Advanced Physical Therapy; Donald E. Kobrin, M.D.; Carolyn M. Fowle, M.D. (CAR 373-437);

15.    May 8, 2002 – Medical report from Alberto G. Lopez, M.D. (CAR 448-462);

16.    April 11, 2005 – CE Psychiatric Evaluation (CAR 485-490);

17.    December 9, 2004 to July 26, 2005 – Medical records from Peach Tree Pain Management (CAR 493-528); and

18.    June 11, 2002 to October 31, 2005 – Medical Expert Report by Peach Tree Pain Management (CAR 529-537).

Pre-1999 – Plaintiff was first seen by Dr. Kobrin on September 24, 1996, for pain in the left leg.  On examination, Dr. Kobrin found some tenderness in the low back area, and subjective decrease in sensation over the lateral left calf to pin and light touch.  His impression was probable L5 nerve root compression syndrom, and suggested an injection at the L5 nerve root, which plaintiff declined, preferring to treat it with medication.  No other medical records are included in the record prior to 1999 except some lab results which appear to be normal and are not relevant to plaintiff's claims.

1999 – Plaintiff was seen by Dr. Kobrin on January 15, 1999, complaining of numbness or heaviness of the left arm and left hand and spasm in the left shoulder.  She also complained about pain in the cervical neck area, but no radicular pain down the arms.  Dr. Kobrin referred her for an MRI scan and cervical spine films.  An MRI was done on January 18, 1999, which showed degenerative disc narrowing present at C5-6 and C6-7.  The degree of foraminal compromise at C5-6 was sufficiently severe that the impression was that impingement on existing roots may occur.  Plaintiff was given Xylocaine and Depo-Medrol injections on January 22, 1999, which significantly improved plaintiff's pain.  Dr. Kobrin then referred her for physiotherapy.  On January 29, 1999, plaintiff was experiencing severe pain in her neck and was prescribed Vicodin.

On January 28, 1999, Plaintiff was evaluated by Advanced Physical Therapy to alleviate pain in her left hand.  On February 11, 1999, plaintiff reported a 30-40% reduction in pain, but by April 1999, any improvement had been only temporary and her condition was worse.

In May 1999, she was discharged from physical therapy with no significant improvement noted.

She was seen by Dr. Kobrin again on February 22, 1999, and although the previous injections were of significant benefit, she continued to experience pain in the cervical neck area and left shoulder radiating down the left arm.  Complaining of progressive pain in the left shoulder and cervical neck, plaintiff again received Xylocaine and Depo-Medrol injections on March 3, 1999, which improved the pain.  On March 8, 1999, Dr. Kobrin performed a nerve conduction study which found a left carpal tunnel/median nerve compression syndrome.  However, plaintiff was unable to tolerate muscle electrode studies in the cervical neck area and Dr. Kobrin found normal muscle electrode studies for the left upper extremity.  Dr. Kobrin found plaintiff unable to work beginning March 8, 1999, due to left tendinitis and carpal tunnel syndrome.

Plaintiff was seen by Dr. Kobrin again on March 22, 1999.  She had continuing pain in her left hand and wrist, but the cervical neck pain and shoulder pain seemed to be improving.  She was seen in the emergency room on March 23, 1999, after fainting at work.  She was observed for an hour and released with instructions to follow-up within one to two days.  A bone scan completed on March 29, 1999, showed minimal asymmetry in the uptake in the arms, likely within the range of normal, and no findings to suggest reflux sympathetic dystrophy.  An x-ray of her shoulder on the same day was normal.  On April 9, 1999, plaintiff reported to Dr. Kobrin that although she continues to experience pain, she is taking very little Vicodin, averaging 10 tablets per week.  On April 23, 1999, plaintiff reported she continues to experience pain, is able to do very little around the house because of the pain, and Dr. Kobrin opined that her problem may be soft tissue musculoskeletal rather than neurologic, and recommended again that she be seen by an orthopedic surgeon.  Dr. Kobrin examined plaintiff on May 19, 1999, and although plaintiff complained of continued and perhaps increased pain, she had full range of motion of the left shoulder, but palpable tenderness in the area.

/ / /

On May 21, 1999, Steven D. McCormick, Ph.D. conducted a psychological evaluation of plaintiff.  Although he did not have medical records to review, Dr. McCormick conducted a Mental Status Examination and Minnesota Multiphasic Personality Inventory -2 (MMPI-2).  Dr. McCormick concluded that this testing suggested that plaintiff was endorsing and exhibiting symptoms of a pain disorder associated with psychological factors and medical condition.  He considered her psychological factors related to her medical condition to be at a moderate level.  He found that she was endorsing symptoms of an adjustment disorder with mixed anxiety and mood disturbance, and recommended that she be seen for short-term individual psychotherapy to increase her management of stress, pain and depression.  However, he also thought, based on a Wahler Physical Symptom Inventory, that plaintiff may be over reporting her physical symptoms.

On June 4, 1999, plaintiff was seen and evaluated by Dr. Levin.  Dr. Levin thought plaintiff was exhibiting many signs of complex regional pain syndrome, and on June 24, 1999, completed a diagnostic stellate ganglion block.  Dr. Levin's notes indicate the ganglion block was successful in completely relieving plaintiff's pain and allowed plaintiff to fully abduct her shoulder which she was not able to do preblock.  Plaintiff saw Dr. Kobrin again on July 19, 1999, and reported she was no better.  She continued to complain of pain primarily in the left cervical neck area, left dorsal shoulder area and left arm.  She had increased her intake of Vicodin, but was limited to 30 per month.

On July 30, 1999, Dr. Levin reported to Dr. Kobrin that there was a discrepancy between plaintiff's recollection of the success of the procedure and his notes.  Plaintiff apparently related to Dr. Levin that she had no pain relief and did not have full range of motion of her shoulder.  Dr. Levin opined that plaintiff's psychological factors may have affected her perception of her pain.  He therefore concluded that plaintiff did not have significant response to the sympathetic block and that he did not believe she had complex regional pain syndrome to any great degree.

On August 26, 1999, plaintiff requested to return to work on a limited basis.  Dr. Kobrin allowed her to return to work limited to working four hours a day on a trial basis with no lifting, pushing, pulling, carrying, typing, or washing dishes.

Plaintiff was evaluated by D'Arcy and Associates for vocational rehabilitation on October 11, 1999.  The evaluation noted limitations in lifting and pushing/pulling, but no limitations in sitting, standing, climbing, bending, reaching below or at shoulder, and handling/feeling.  The evaluator noted plaintiff had a positive attitude and indicated a willingness to cooperate throughout the rehab process, had a positive outlook, was energetic and enthusiastic toward vocational rehabilitation services.

Plaintiff was not seen by Dr. Kobrin again until November 24, 1999, as part of her evaluation for participation in the vocational rehabilitation.  She wanted to participate in a rehabilitation plan to train as a computer network technician, and believed she would be able to work 8 hours per day and within the limitations in the job description.  She reported that she felt she could push/pull items up to 25 pounds with help, lift two pounds without difficulty, wash dishes, use keyboards repetitively or a mouse repetitively for up to 30 minutes.  Dr. Kobrin also believed she could perform these duties.

2000 – By February 2000, plaintiff had completed her vocational rehabilitation. D'Arcy and Associates' progress report indicated plaintiff "was a model student and completed her training with flying colors."  However, there are no medical records until November 2000, when plaintiff was evaluated by Dr. MacMorran, QME.  Following a variety of tests, Dr. MacMorran diagnosed plaintiff with cervical spine sprain, degenerative disc disease at C5-6 and C6-7, left shoulder sprain, left carpal tunnel syndrome, and psychological stress disorder.  His positive orthopedic findings included:

    1.      X-rays of the cervical spine show disc space narrowing with posterior osteophyte formation impinging at the intervertebral foramia on the left at the C5-6 and C6-7 levels.

/ / /

2.      EMG and nerve conduction velocity studies were interpreted by Dr. Kobrin as "left carpal tunnel/median nerve compression syndrome."

3.      There is decreased grip strength of the right (dominant) hand compared to normal.

4.      There is decreased reflex and motor strength on the right hand compared to normal.

5.      There is decreased sensation to pinwheel examination and light touch at the left and right index fingers (C5 & C6).

6.      There is also decreased sensation at the right side of each thumb.

7.      There is spinous process tenderness in the mid and lower cervical region; there is cervical paraspinal muscle spasm and tenderness posteriorly at the left.

8.      There is 40% loss of overall range of motion of the cervical spine compared to normal.

9.      There is decreased range of motion of the left shoulder compared to normal.

10.     There is left shoulder and trapezius pain when the left shoulder is abducted against resistance from 70° to full abduction.

11.     There is 40% biceps power loss of the left arm (compared to the right).

12.     There is 30% triceps power loss of the left arm (compared to the right).

The subjective findings included:

1.      Neck pain is descried as constant, and characterized as slight-to-moderate pain while performing light work, increasing to moderate upon engaging in heavy work.

2.      Left shoulder pain is described as constant, and characterized as pain varying from slight to greater-than-moderate in intensity.  Ms. Leyba is unable to perform any work activities at or above shoulder level with the left arm because of the condition of her left shoulder.

3.      The patient is also unable to perform any repetitive activities with the left arm because of the condition of the left shoulder and arm.

4.      Ms. Leyba is unable to perform activities of pulling and pushing with the left arm because of the condition of the left shoulder and left wrist.

5.      The patient is unable to perform any forceful gripping with the left hand because of the condition of her left wrist and fingers.

6.      Ms. Leyba is also unable to perform fine manipulative finger activities with the left hand because of numbness and a feeling of "clumsiness."

Dr. MacMorran opined that plaintiff is unable to perform heavy lifting, repeated bending, and stooping, working above shoulder level with the left arm, forceful gripping with the left hand, fine manipulation of the fingers of the left hand, repetitive activities with the left arm, and pulling or pushing with the left arm.

2001 – Dr. Jordan examined plaintiff in January 2001, for a neurologic consultation at the request of the Department of Social Services.  Following her examination, Dr. Jordan's impression was that plaintiff has chronic neck pain with radiculopathy, with degenerative cervical disc disease, with spodylosis and decreased range of neck motion, tenderness and spasm, as well as some sensory changes.  Subjectively, Dr. Jordan reported that plaintiff has constant pain of moderate to severe intensity.  Dr. Jordan found that plaintiff is limited by her neck pain, which limits overall ability to turn her head and neck.  This suggests a limitation in driving and overhead work to occasional, occasional reaching, handling and use of push-pull devices with the left arm, and limited to lifting and carrying 10 pounds frequently and 25 pounds occasionally.  Standing, walking and sitting were estimated at 6 hours with customary breaks.

Plaintiff had a physical residual functional capacity assessment (RFC) on February 6, 2001, which was reviewed on July 5, 2001.  Although the hand written notes on the RFC are largely illegible, the reviewing physician did find some limitations in plaintiff's ability to lift, push/pull, reach, handle, and fingering, which were not significantly different from plaintiff's treating/examining source conclusions.

Plaintiff had a complete psychiatric evaluation performed by Dr. Bates, at the request of the Department of Social Services, on February 18, 2001.  Dr. Bates diagnosed

plaintiff with major depression, panic disorder with agoraphobia and gave her a global

assessment functional scale of 68.  Her functional assessment, based on a mental status

examination, was that plaintiff had:

1.  Ability to understand, remember, and carry out <u>simple</u> one or two-step job instructions: not significantly limited.

2.  Ability to do detailed and <u>complex</u> instructions: not significantly limited.

3.  Ability to relate and interact with supervisors, coworkers, and the public: not significantly limited.

4.  Ability to maintain concentration and attention, persistence and pace: moderately limited.

5.  Ability to associate with day-to-day work activity, including attendance and safety: not significantly limited.

6.  Ability to adapt to the stresses common to a normal work environment: moderately limited.

7.  Ability to maintain regular attendance in the work place and perform work activities on a consistent basis: not significantly limited.

8.  Ability to perform work activities without special or additional supervision: not significantly limited.

Dr. Bates found that plaintiff's condition was expected to improve in the next

twelve months, especially if she resumed her medication and mental health treatment.

On March 8, 2001, plaintiff had a mental residual functional capacity assessment.

The reviewing physician found plaintiff to be moderately limited in her ability to maintain

attention and concentration for extended periods and her ability to complete a normal workday

and workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without unreasonable number and length of rest periods.  She was found to have

medically determinable impairments of major depression and panic disorder.  A rating of

plaintiff's functional limitations indicated plaintiff was moderately limited in maintaining

concentration, persistence, or pace, but there was insufficient evidence to determine if she suffers

repeated episodes of decompensation, each of extended duration.

Plaintiff then saw Dr. Kobrin again on April 26, 2001.  She was still reporting

pain over the left shoulder and cervical neck area.  He stated that plaintiff "has undergone a

number of tests by me for chronic regional pain syndrome and other causes of her pain

symptoms, but I have never found any objective tests which would correlate with her tests." He opined that because of her complaints, she is totally disabled. On July 26, 2001, Dr. Kobrin prescribed Lidoderm patches and over-the-door neck traction, and recommended plaintiff undergo psychiatric evaluation for depression. On August 27, 2001, Dr. Kobrin gave plaintiff a prescription for physiotherapy, counseling and a psychiatric evaluation. On September 19, 2001, Dr. Kobrin prescribed plaintiff a Tens unit for her neck and shoulder strain, and an orthopedic pillow on November 28, 2001.

Plaintiff went to physical therapy from September 13, 2001 through December 5, 2001. However, she was unable to tolerate even the most basic exercises, and did not demonstrate any significant improvement.

On October 15, 2001, Dr. Fowle reported to Dr. Kobrin that her diagnostic impression was mood disorder due to a general medical condition with depressive features. She recommended weekly individual psychotherapy for six months.

By November 2001, plaintiff reported to Dr. Kobrin that she was continuing to take Vicodin (20 to 30 per month) plus Tylenol (four per day), and that the Tens unit was helping. On December 30, 2001, Dr. Fowle completed a Primary Treating Physician's Progressive Report for plaintiff's workers' compensation claim. In that report, Dr. Fowle reported that plaintiff's diagnosis was major depression, due to constant excruciating pain and truncated life activities emanating from a Regional Pain Syndrome. Dr. Fowle opined that plaintiff is permanently totally disabled.

2002 – On January 17, 2002, plaintiff reported to Dr. Kobrin that her neck pain had significantly increased. Dr. Kobrin injected her trigger points with Xylocaine and Depo-Medrol, and increased her Vicodin. By January 28, 2002, plaintiff reported that her neck pain had improved. Dr. Kobrin started her on Neurontin.

On March 9, 2002, Dr. Fowle completed a new progress report for plaintiff's workers' compensation claim, stating plaintiff continues to be permanently totally disabled, with

1    a diagnosis of major depression, and suicidal ideations.  On this same date, Dr. Fowle completed

2    a Medical Source Statement concerning plaintiff's mental impairments.  Dr. Fowle opined that

3    plaintiff was markedly limited in all categories, and commented that plaintiff is totally disabled

4    due to the severity of her pain syndrome and resulting major depression.  She also states that

5    plaintiff's ability to concentrate have become severely impaired due to her pain, she is forgetful,

6    and her fiancé cooks, cleans and takes care of her.

7            On March 12, 2002, plaintiff saw Dr. Kobrin for the last time in the medical

8    records before the court.  She reported she continues to experience pain in the cervical neck,

9    shoulders, down the arms, writs, hands, etc.  She continued to use the Tens unit, and counseling

10   with Dr. Fowle.  She discontinued the Neurontin due to its side effects, but continued to use

11   Tylenol and Vicodin.

12           On April 30, 2002, plaintiff was evaluated by Dr. Lopez.  Dr. Lopez performed a

13   mental status examination, diagnosed her with major depression, recurrent, of moderate intensity,

14   and gave her a global assessment of functioning of 55.   He found plaintiff's

15           ability to comprehend and follow simple instructions is slightly
             impaired because of her poor memory and concentration.  Her
16           ability to follow detailed and complex instructions is slightly
             impaired for the same reasons. [Her] ability to relate to others in a
17           workplace, whether they be co-workers, supervisors, or the public,
             is impaired because of her continuing depression and crying. [Her]
18           ability to maintain a work pace appropriate to a given workload is
             slightly impaired because of problems with energy and sleep.  Her
19           ability to adapt to stressors in her work environment is slightly
             impaired.  Her ability to maintain a regular attendance is quite
20           impaired, given her problems with energy and lack of motivation
             because of her depression.

21

22           Dr. Lopez opined that plaintiff's prognosis is guarded, but that she might improve

23   with the addition of antidepressant medication.  The Medical Source Statement Dr. Lopez

24   completed indicated that plaintiff is moderately limited in her ability to maintain attention and

25   concentration for extended periods; perform activities within a schedule, maintain regular

26   attendance and be punctual within customary tolerances; sustain an ordinary routine without

special supervision;  complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public or customers; and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  He opined that work-related stressors would increase the level of impairment including demanding customers, production demands, demand for precision, need to make quick decisions, need to make accurate decisions, and that routine, repetitive, simple, entry-level jobs would serve as stressors which would exacerbate psychological symptoms.  He also stated that plaintiff's impairment would cause her to be unable to complete a workday more than three or four times per month.

2004 – On December 9, 2004, Dr. Serrano of Peach Tree Pain Management completed a Primary Treating Physician's Progress Report.  Dr. Serrano's report indicates plaintiff continued to receive treatment for her neck pain, including acupuncture and MRIs. However, no treatment records are available to the court for these treatments.  Dr. Serrano indicates plaintiff continued to take Vicodin for pain relief, and her range of motion of the left shoulder was restricted due to pain.

On December 12, 2004, plaintiff had a comprehensive internal medical evaluation by Dr. Johnson.  During her examination, Dr. Johnson found her efforts were poor, and that she was exaggerating her symptoms.  He states that her efforts on the physical examination seemed to be a deliberate performance rather than a genuine demonstration of illness or injury.  Dr. Johnson was unable to make an objective functional assessment of plaintiff until further tests had been completed.

2005 – On January 6, 2005, Dr. Serrano completed another progress report recommending continuation of acupuncture once per week, which plaintiff reported significantly helped relieve her pain and she was able to reduce the amount of pain medication she was taking. On February 2, 2005, plaintiff was seen by William Chinnock, L.Ac., also at Peach Tree Pain

1   Management, who also recommended continuation of acupuncture.  On February 3, 2005,

2   plaintiff saw Dr. Fisher, who indicated that plaintiff's neck continued to cause her pain, there was

3   severe generalized tenderness over the entire cervical spine and paraspinals, but no atrophy was

4   noted of the left hand compared to the right. Plaintiff reported to Dr. Fisher that her shoulder was

5   examined by Dr. Williamson, but it was determined to be non-surgical and a steroid injection

6   was given to see if that would decrease her pain and discomfort.  Plaintiff continued to take

7   Vicodin and Lexapro.   Dr. Serrano saw plaintiff again on March 10, 2005, and plaintiff reported

8   the steroid injection Dr. Williamson gave her did not improve her pain.  Plaintiff continued to

9   use the Tens unit.  Dr. Serrano noted an MRI was done on September 23, 2004, which showed

10  mild impingement and rotator cuff tendinopathy, but no evidence of rotator cuff tear as to the

11  shoulder, and segmental spinal canal stenosis of C4-C5, C5-C6, and C6-C7 as to the cervical

12  spine.  Dr. Serrano reported that Dr. Williamson opined that plaintiff has reflex sympathetic

13  dystrophy (RSD) versus cervical spine pathology, the shoulder was not the source of plaintiff's

14  pain, and plaintiff has RSD and possibly had that diagnosis for awhile.  Dr. Serrano found

15  plaintiff had a restricted range of motion of the cervical spine and left shoulder.  The range of

16  motion of the cervical spine revealed flexion 30/50, lateral flexion 30/45, extension 40/50, and

17  rotation 50/80.  The range of motion of the left shoulder showed forward flexion 90/150,

18  extension 40/40, abduction 90/150, adduction 30/30, external rotation 50/90, and internal

19  rotation 40/80.

20          Plaintiff saw William Chinnock again on March 29, 2005.  Plaintiff reported a

21  pain level of 3, on a scale of 0 to 10, and an ability to function more normally with continued

22  acupuncture.  On April 7, 2005, plaintiff saw Dr. Serrano again.  Plaintiff had resumed

23  acupuncture, and noticed improvement.  She also noticed an improvement in her depression, for

24  which she was still taking Lexapro.  Dr. Serrano reported a bone scan showed reflex sympathetic

25  dystrophy of the left upper extremity and an EMG  showed left carpal tunnel syndrome.  Dr.

26  Serrano noted that Dr. Williamson opined that plaintiff's pain is psychosocial pain because the

1   injection she received did not help her.  She noted plaintiff's neck range of motion was still

2   mildly restricted and her left shoulder range of motion was still restricted moderately.

3          Plaintiff saw Dr. Thurstone on April 11, 2005 for a comprehensive psychiatric

4   evaluation.  Although Dr. Thurstone had no medical records available, she did do an

5   examination.   Dr. Thurstone found plaintiff's abilities to be good or fair for most categories,

6   except as to her ability to complete workday or workweek and perform at consistent pace due to

7   chronic pain in her neck and left upper extremity, and her wrist and hand, which Dr. Thurstone

8   found to be poor.  Dr. Thurstone found plaintiff was not impaired in her ability to respond

9   appropriately to supervision, co-workers, or work pressures.  Plaintiff had good social interaction

10  with Dr. Thurstone and a patient in waiting room, who she helped Dr. Thurstone with translation.

11         On May 5, 2005, plaintiff saw Dr. Serrano again, and reported much improvement

12  with acupuncture.  Plaintiff had full range of motion of her left shoulder, with pain at extremes,

13  but her neck range of motion was still restricted.  However, further acupuncture treatment was

14  denied.  On June 7, 2005, plaintiff was referred to physical therapy again.  She again had

15  decreased range of motion of the neck, and the left shoulder range of motion was limited and

16  painful.  On June 24, 2005, plaintiff reported to Dr. Rao an increase in left shoulder pain due to

17  physical therapy.  She had continued limited range of motion and tenderness.  Dr. Rao refilled

18  her prescription for Lexapro, and started her on Gabapentin, for her neuropathic pain.  She saw

19  Dr. Rao again on June 24, 2005.  Plaintiff's range of motion was improved, but her pain was still

20  elevated.  Dr. Rao found her range of motion very limited with abduction to about 60 degrees,

21  forward flexion about 60 degrees, and internal rotation at the level of L4-L5.  Plaintiff's Vicodin

22  was refilled, but she was allergic to the Gabapentin.

23         On August 30,2005, plaintiff reported to Dr. Rao cramping in the left pectoralis

24  musculature, so that she could not hold or carry objects.  Range of motion continued to be very

25  limited.  Plaintiff continued to report pain and limited range of motion at her October 11, 2005

26  exam.

On November 29, 2005, plaintiff saw Dr. Kalman, who performed a mental status examination and provided a medical source statement.  Dr. Kalman opined that plaintiff is able to relate with supervisors and coworkers, deal with the public, and understand, remember, and carry out simple one- or two-step job instructions.  She has decreased memory, and decreased ability to withstand the stress and pressures associated with daily work activities.  Dr. Kalman diagnosed plaintiff with adjustment disorder and depression, secondary to general medical condition.  He opined that plaintiff was not expected to improve significantly in the next 12 months unless her physical condition improves, but found she was not significantly limited in most categories.  He found she was mildly limited in several categories, including ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration, work a normal workday and workweek, and accept instructions and criticism from supervisors.  Dr. Kalman found no moderate limitations.

**B.      Summary of Plaintiff's Hearing Testimony**

Two hearings were held in this matter, one on May 1, 2002, and the other on November 29, 2005.  Both of these hearings were held before Administrative Law Judge William Thompson, and plaintiff testified at both hearings.

At the first hearing, plaintiff testified that she had been off work since 1999.  She attempted to return to work in August of 1999, but her employer asked her to leave because the employer could not accept her on the temporary part-time basis with the restrictions she was given.  Her employer would not even let her start work.  She testified that she worked for Clark Pest Control as an administrative assistant for more than five years.  Her position required a lot of secretarial work, including typing and data entry.  She was required to lift boxes of copy paper, walk about two hours a day, stand for about a half an hour, and sit for six hours.  She worked a 40-plus hour work week.  She used Word and Excel.  She had an on-the-job injury where she fell on the employer's premises, tripping over a file box.  She also testified that her prior work history included other clerical work and data entry.

1       As to her daily activities, plaintiff testified that when she showers, it usually takes

2  her over an hour because of the pain.  She can dress herself, but she usually either stays in her

3  pajamas or wears sweats.  She tries to do housework, but eats foods she does not have to cook.

4  Her boyfriend does most of the cooking.  She watches television, an hour at a time.  She has a

5  friend take her to the grocery store because it hurts to drive.  She does drive to her doctors

6  appointments.  She sees Dr. Fowle, a psychologist, every week or every other week.  She was not

7  taking any medication to help with her mental conditions.

8       She gets tired from a lot of walking, can walk 40 minutes to an hour.  After that

9  she is in pain.  She can stand for about two hours, in 20 minute increments, but sitting can cause

10  pain in her back which radiates to her whole left side.  She experiences pain with lifting, but not

11  limited in lifting with her right side.  She can use her right hand to dial a phone, but not her left.

12  She no longer can concentrate when reading, so she does not read books any more.  She

13  continues to have suicidal thoughts.

14       William Wetzel testified at this first hearing as a vocational expert.  The ALJ

15  proposed the following hypothetical for Mr. Wetzel: "consider for me please an individual who is

16  43 years old, with a GED and that past relevant work [clerical and data assistant work].  Also

17  consider that she can lift 20 pounds occasionally, and 10 pounds frequently.  She can stand and

18  walk in combination for six or more hours in the day, and can sit during any period of the day

19  when not standing or walking.  She can occasionally bend, stoop, twist, squat, kneel, and crawl,

20  but should not climb or work at heights.  She should also not work around hazardous moving

21  machinery.  She should not be exposed to extremes of heat, humidity, or cold.  The individual

22  would be limited to occasional reaching, handling, and use of push/pull devices with the left non-

23  dominant upper extremity.  She should also work overhead only occasionally with that left non-

24  dominant upper extremity.  There is no restriction on the use of the dominant right extremity."

25  The vocation expert found, under that hypothetical, she could perform all of her past work.  If

26  this hypothetical was further limited by mental impairments to performing only work involving

simple instructions and one- and two-step processes, that would rule out past work.  However, there would be other jobs she could do with those restrictions, including information clerk, charge account clerk, ticket taker, and cashier.  However, if the limitations plaintiff testified to were also included, she would not be able to perform those or other jobs.

If the hypothetical was further limited by a sit/stand/walk option, which the individual was not able to do for more than four hours a day, and was restricted totally from lifting, pushing, pulling, carrying, typing, and other tasks such as dishwashing, she would not be able to perform either past work or other work.  The vocational expert also stated that if she was relegated to unskilled sedentary work, she would have to have substantial use of both upper extremities.

The second hearing was held on November 29, 2005.  Plaintiff again testified that she worked for Clark's Pest Control, full-time, from June 1994 until March 1999 as an administrative assistant.  As the administrative assistant, she typed business letters, took dictation, typed minutes, filing, etc.  She would lift reams of paper, but no files over ten pounds.  She would spend three to four hours standing and walking in combination.  She had other secretarial and data entry work experience, which did require lifting of files over ten pounds about once a day.  She also had prior work experience as a notary public.

Plaintiff testified that she is in pain every day in the upper left extremities.  She had been treated at Peachtree Pain Management for the pain including acupuncture and physical therapy.  The acupuncture helped the pain subside.  She has been wearing a cervical collar off and on since 1999.  She did receive injections in her neck which helped her pain, but did not eliminate it altogether, just made it tolerable.  She takes Lexapro as an anti-depressant.  She continues to experience symptoms of depression when under stress, feeling like everything is caving in on her, crying, isolation.

She does some housework, including picking up clothes and cleaning the bathroom.  However, cleaning a bathroom takes her a few days.  She cleans the tub with her feet,

19

1   and uses a Dustbuster to sweep.  Her nephew comes over to do her vacuuming, although she can

2   sometimes do a portion of it.  She can cook simple meals like oatmeal, or helps her boyfriend

3   cook.  She is able to wash dishes, with breaks, and limited laundry.  Lifting the wet clothes hurts

4   her neck and left side, as does bending down to get the clothes out of the dryer.  She spends her

5   day playing with her cats, talking to her neighbors, visiting at her mother's.  Someone has to help

6   her with her grocery shopping because she cannot push the cart.  She also cannot lift heavy

7   things, like sodas, but she can lift a gallon of milk.

8          She gets tired walking, but her walking is not impaired.  Her fatigue increases her

9   pain.  Standing is difficult after about 45 minutes to an hour.  She is able to sit for about 45

10  minutes before needing to change.  She watches television during the day, but does not read.  Her

11  right arm gets sore, tired and hurts because she has to use it to accommodate her inability to use

12  her left arm.  She is very careful with the amount of Vicodin she takes.  She takes the Vicodin

13  about four times out of the week.  The other three days she just takes Tylenol.  She also uses

14  meditation to help control her pain.

15          Susan Crayton-Clovel testified at the second hearing as a vocational expert.  The

16  ALJ proposed the following hypothetical for Ms. Crayton-Clovel: "a 46-year-old individual with

17  a GED [with past work experience as a secretary, customer service, administrative assistance].

18  Further consider that this individual is capable of lifting 20 pounds occasionally, and ten pounds

19  frequently.  She's capable of standing and walking in combination for at least six hours in a work

20  day and capable of sitting without limit but not required to stand or walk.  She cannot perform

21  overhead reaching with the left, non-dominant upper extremity.  With regard to the left non-

22  dominant upper extremity, she's also limited to occasional reaching and occasional . . . . handling

23  and occasional fingering and has slightly decreased sensation in the left non-dominant upper

24  extremity.  No restrictions on the right dominant upper extremity.  Those are the only limits, with

25  the limits of the jobs needed to be performed."  With this hypothetical, the vocational expert

26  found plaintiff would not be able to do her past work, but there were jobs she could do with

transferable skills, including information clerk, collector, photo counter clerk, and usher.

Plaintiff's attorney then proposed additional limitations to the hypothetical, including an inability to function completing a normal work day or work week, work at a consistent pace, suffers from irritability, and need to change positions with limited use of left arm, wrist and hand.  In response, the vocational expert stated, looking at just one part of that hypothetical, "no useful ability to complete a normal work day or work week, that would eliminate all jobs in the national economy."

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

# IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues that the ALJ erred in two ways in determining that she was not disabled.  Specifically, plaintiff argues: (1) the ALJ erred in finding plaintiff did not suffer from a minimally severe mental impairment and failed to provide any specific reasons for discrediting the opinions of every mental health specialist who examined, treated, or even just reviewed plaintiff's medical records; and (2) the ALJ failed to articulate specific and legitimate reasons for discrediting the opinion of Dr. MacMorran, failed to explain his basis for not crediting the opinion of the state agency physician as to repetitive neck motions, and failed to resolve with meaningful analysis material contradictions in the evidence.

## A.  Mental Impairment

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

1    1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

2    rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

3    81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

4    the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

5    finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

6    legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

7    professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

8    without other evidence, is insufficient to reject the opinion of a treating or examining

9    professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

10   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

11   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

12   see also Magallanes, 881 F.2d at 751.

13          In determining residual functional capacity, the ALJ must assess what the plaintiff

14   can still do in light of both physical and mental limitations.  See 20 C.F.R. §§ 404.1545(a),

15   416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual

16   functional capacity reflects current "physical and mental capabilities").  Where there is a

17   colorable claim of mental impairment, the regulations require the ALJ to follow a special

18   procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record pertinent

19   findings and rate the degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

20          In this case, there are records and evaluations of plaintiff by treating, examining

21   and reviewing physicians.  Plaintiff's treating physician for her mental impairments was Dr.

22   Fowle.  Dr. Fowle's medical source statement indicates that plaintiff is markedly limited in all

23   categories, and is completely disabled.  The ALJ gave Dr. Fowle's opinion no controlling weight

24   because he found it inconsistent with the remainder of the medical records, including Dr. Fowle's

25   own records.  Plaintiff was also examined by Drs. Bates, Lopez, Thurston and Kalman.  Dr.

26   Bates found some limitations, but that plaintiff was not significantly limited in most categories.

Dr. Bates did find plaintiff moderately limited in her ability to maintain concentration and attention, persistence and pace, and in her ability to adapt to the stresses common to a normal work environment.  The ALJ gave Dr. Bates' opinion some weight.  Dr. Lopez also found plaintiff to be moderately limited in attention and concentration, regular attendance, ordinary routine, normal workday or workweek, interaction with the public and getting along with co-workers.  She was mildly limited in most other categories.  The ALJ gave Dr. Lopez' opinion some weight, noting the report was thorough, detailed and somewhat consistent with the record as a whole.

Dr. Thurston opined that plaintiff would have difficulty in performing work activities on a regular basis.  The ALJ gave this opinion little weight because it was based on physical, not mental, impairments and was not supported by objective evidence in the record. Finally, Dr. Kalman found plaintiff was not significantly limited in most categories, and only mildly limited in her ability to understand and remember, carry out instructions, attention and concentration, work a normal workday or workweek, and accept criticism.  Interestingly, the ALJ accorded this opinion little weight because it was based on subjective complaints unsupported by testing or observation.

The ALJ found plaintiff's "mental condition causes [plaintiff] to experience no restrictions in the claimant's activities of daily living; mild difficulties maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. [Plaintiff] has not had an episode of decompensation of extended duration."

A reviewing physician (who's signature is unintelligible) completed a mental residual functional capacity assessment and found plaintiff moderately limited in concentration and attention and working a full workday or work week without unreasonable periods of rest. The ALJ gave some weight to these findings because the form was complete and the initial medical consultant's assessment were reviewed by another medical consultant whose specialty is psychiatry.

1    Altogether, there is only one physician who found plaintiff not at least moderately

2    limited in her ability to maintain attention and concentration for extended periods and/or her

3    ability to complete a normal workday or workweek.  This one physician's opinion, who is the

4    only one to support the ALJ's finding of no mental impairment, the ALJ gave little weight.  The

5    ALJ gave specific and legitimate reasons for rejecting Dr. Thurston and Dr. Kalman's opinions,

6    that they were not supported by the evidence, and were based only on plaintiff's subjective

7    reports.

8    The ALJ gave "some weight" to Drs. Bates, Lopez and the RFC, who all indicated

9    that plaintiff had moderate limitations.  The ALJ did not explain or give reasons as to why he

10   afforded these examining physicians' opinions only some weight.  He simply did not agree with

11   these moderate limitations, and found plaintiff was only mildly limited in maintaining

12   concentration, persistence or pace.  He did not address the physicians' findings of any limitation

13   in her ability to complete a normal workday or workweek.  The Commissioner may reject an

14   uncontradicted opinion of a treating or examining medical professional only for "clear and

15   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

16   The ALJ fails to explain how he found only mild limitations when the examining medical

17   professionals found moderate limitations.  He further failed to specifically identify how the

18   medical opinions conflicted, or what medical records supported his finding that Dr. Fowle's

19   opinions were inconsistent with plaintiff's medical history.  Even assuming that Dr. Fowle's

20   opinions were inconsistent with plaintiff's medical history, the examining physicians all found

21   plaintiff's abilities at least moderately limited in some categories.  The court's review of

22   plaintiff's medical records indicates a consistent diagnosis of major depression with resulting

23   moderate limitations in her ability to maintain attention and concentration as well as completing

24   a normal workday or workweek.  The ALJ fails to provide clear and convincing reasons

25   supported by substantial evidence in the record for his findings of only mild limitations.

26   Accordingly, the ALJ's hypothetical proposed to the vocational experts failed to

include limitations in plaintiff's ability to maintain attention and concentration or to complete a normal workday or workweek. Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988). The hypothetical the ALJ proposed did not include all of plaintiff's limitations, and therefore was not supported by substantial evidence in the record as a whole.

The court therefore finds the Commissioner's final decision is not based on proper legal standards and is not supported by substantial evidence in the record as a whole.

### B.   Physical Impairments

Plaintiff argues that the ALJ failed to articulate specific and legitimate reasons for discrediting the opinion of Dr. MacMorran, failed to explain his basis for not crediting the opinion of the state agency physician as to repetitive neck motions, and failed to resolve with meaningful analysis material contradictions in the evidence.

The ALJ found that the plaintiff "retains the residual functional to perform a range of light work as follows: lift 20 pounds occasionally and 10 pounds frequently; stand and walk in combination for 6 hours; sit without limit when not standing or walking; no overhead reaching with the left nondominant arm; limited to occasional reaching, handling and fingering with the left nondominant arm; and, a slight decreased sensation in the left nondominant arm." As stated above, if substantial evidence supports the administrative findings, the finding of the Commissioner is conclusive and will not be disturbed by the court on review. Here, the ALJ

relied primarily on two examining physician's conclusions as to plaintiff's physical abilities.  The ALJ rejected plaintiff's treating physician's opinion because he found that they were based on plaintiff's subjective complaints and not supported by testing or observation.

There is substantial evidence to support the ALJ's finding that plaintiff has the ability to occasionally reach, as well as occasional handling and fingering with her left arm.  Dr. Jordan, who's opinion the ALJ gave substantial weight to, found plaintiff was able to occasionally reach, perform limited feeling, and occasionally work overhead.  Dr. MacMorran, who's opinion the ALJ also gave substantial weight to, found plaintiff was unable to perform heavy lifting, repeated bending, and stooping, working above shoulder level with the left arm, forceful gripping with the left hand, fine manipulation of the fingers of the left hand, repetitive activities with the left arm, and pulling or pushing with the left arm.  Dr. Jordan's evaluation was done in 2001, after Dr. MacMorran's evaluation in 2000.  The ALJ's finding is further supported by the RFC completed in 2001 which found some limitation in plaintiff's ability to reach over shoulder, and occasional handling and fingering.  Dr. Jordan's opinion is not significantly inconsistent with Dr. MacMorran's finding of limitation in her abilities.  The court therefore finds that the ALJ's findings as to plaintiff's physical abilities is supported by substantial evidence in the record as a whole.

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.     Plaintiff's motion for summary judgment is granted;

2.     The Commissioner's cross motion for summary judgment is denied;

3.     This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.


DATED: March 26, 2008


                                        _____
                                        **CRAIG M. KELLISON**
                                        UNITED STATES MAGISTRATE JUDGE